UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **OMAR SHABAZZ and DONALD WALLACE aka PERRINGTON,**<br><br>                              Plaintiff,<br><br>              -against-<br><br>**KIERAN KAILER, Tax I.D.# 932839, and THE CITY OF NEW YORK,**<br><br>                              Defendants. | Index No. 15-CV-2798 (JGK)<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiffs Omar Shabazz and Donald Wallace aka Perrington, by and through their attorneys, Peter A. Cross and Robert Rickner of Eaton & Van Winkle, LLP, complaining of the defendants, state as follows:

## INTRODUCTION

1. Plaintiff Omar Shabazz, hereinafter referred to as "Shabazz" was wrongly convicted in 2008 of weapons possession. He served nearly 6 years of the sentence before the New York Court of Appeals reversed.

2. Plaintiff Donald Wallace aka Perrington, hereinafter referred to as "Wallace" was wrongly convicted in 2008 of weapons possession. He served nearly 6 years of the sentence before the New York Court of Appeals reversed.

3. Shabazz and Wallace's wrongful conviction was caused by the New York City Police Department ("NYPD") officer Kieran Kailer, hereinafter referred to as "Officer Kailer" who manufactured evidence and testimony in order to convict Shabazz and Wallace.

1

## JURISDICTION

4. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over claims arising under 42 U.S.C. § 1983.

5. Supplemental jurisdiction over Shabazz's state law claims exists pursuant to 28 U.S.C. § 1367(a).

6. Shabazz has complied with the requirements of New York General Municipal Law Section 50-i by serving a notice of claim on the City of New York Office of the Comptroller on September 19, 2014, within the time required by New York General Municipal Law Section 50-e. More than 30 days have elapsed since the service of that notice and no offer of settlement has been made.

7. At the request of the City of New York Office of the Comptroller on December 8, 2014, Shabazz submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

## VENUE

8. Pursuant to 28 U.S.C. § 1391 (b) venue is proper in the Eastern District of New York, the judicial district in which the claims arose.

## JURY DEMAND

9. Pursuant to the Seventh Amendment of the United States Constitution, the plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

10. PLAINTIFF OMAR SHABAZZ ("Shabazz") was at all times material to this complaint a citizen and resident of the State of New York.

11. PLAINTIFF DONALD WALLACE ("Wallace") was at all times material to this complaint a citizen and resident of the State of New York.

12. DEFENDANT CITY OF NEW YORK is a political subdivision of the State of New York existing by virtue of the laws of the State of New York and is considered a person amenable to suit.

13. DEFENDANT KIERAN KAILER ("Officer Kailer"), Tax I.D.# 932839, Shield No. 19592, at all times relevant to this complaint was a duly appointed and acting police officer of the New York City Police Department, an agency of the Defendant City of New York, and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of New York and the State of New York.

## NATURE OF THE ACTION

14. This action arises under the Constitution and laws of the United States, particularly 42 U.S.C. §§ 1983, 1985 and 1988 and the laws of the State of New York for the malicious prosecution of Shabazz and Wallace.

## FACTS

15. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

16. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

17. ███████████████████████████████████████████████████████████████████.

3

**The Arrest**

18. On January 9, 2008, just before midnight, Shabazz was in a car, in the back seat behind the driver, going south on Adam Clayton Boulevard. Michael Arroyo was driving, Donald Wallace was in the front passenger seat, and Karla Cornielle was in the backseat behind Wallace.

19. Cornielle had a black purse with her. It was approximately 12 inches by 8 inches. It had a flap, and a latch.  It was latched closed.

20. They were not smoking marijuana, and there was no alcohol inside the passenger area of the car, although there was some alcohol in the trunk: an unopened bottle of Champaign and a full, closed bottle of Grey Goose.

21. Cornielle was hungry and wanted some Chinese food, so they stopped the car at 135th Street and Adam Clayton Boulevard so that Cornielle could go to a restaurant between Adam Clayton Boulevard and Fredrick Douglas Boulevard. She left the car, with her purse, and walked to the restaurant.

22. While Corneille was buying Chinese food, the car circled the vicinity several times, going down Adam Clayton Boulevard, making a U-turn, driving the other direction for a few blocks, and then making another U-Turn.

23. Officer Kailer, and his partner Sergeant Gerry Albin, were in an unmarked police car and started to follow Arroyo, Wallace, and Shabazz as they drove north on Adam Clayton Boulevard.

24. When Cornielle exited the restaurant with her food in a bag, Arroyo drove up to her and she got back into the passenger seat behind Wallace.

25. Officer Kailer and Sergeant Albin observed Cornielle enter the car with her purse and her food.

4

26. Arroyo proceeded north on Adam Clayton Powell Boulevard and stopped for a red light at the next corner. When the light turned green, Officer Kailer and Sergeant Albin started flashing blue lights in the unmarked police car. Arroyo pulled the car over immediately. At this point it was early in the morning on January 10, 2008.

27. Moments after the stop, at least one other police car arrived as back-up, with more officers, whose names are not known at this time. On information and belief, Officer Kailer and Sergeant Albin called for back-up before they pulled the car over.

28. Officer Kailer approached the driver's side, and asked Arroyo for his license. He provided it, and then Officer Kailer asked him to get out of the car.

29. At the same time, Sergeant Albin walked to the passenger side and asked Wallace to get out of the car. Wallace complied.

30. Sergeant Albin then asked Cornielle to get out of the car. Cornielle started to step out with her Chinese food and her closed purse, but Sergeant Albin told her to "put that shit back down." Cornielle placed her closed purse right where she had been sitting. Sergeant Albin then told her to put her Chinese food in the car as well, so she placed it on top of her closed purse.

31. Officer Kailer then asked Shabazz to get out of the car.

32. Officer Kailer and Sergeant Albin never said why the car, and its occupants, were being detained.

33. Officer Kailer was belligerent from the start, and shouted, "I know you all have something."

34. Almost immediately after Cornielle had placed her purse and Chinese food back in the car, Officer Kailer started searching the car. He did not have a warrant.

5

35. Officer Kailer grabbed Cornielle's purse, and apparently felt that there was a gun inside. He unlatched the purse, opened it, and then proclaimed: "I found lunch." He pulled a gun out of the purse and showed it to the officers. It was a small 9mm handgun – 5 1/8" by 6 1/8" – and weighed approximately 19 oz. He clutched the gun with his hand, without wearing a glove.

36. Shabazz, Arroyo, Cornielle, and Wallace were then handcuffed and taken to the 32nd Precinct.

37. Once inside the Precinct, Arroyo admitted that he had a small amount of marijuana, and surrendered it.

38. Shabazz, Arroyo, Cornielle, and Wallace were placed into holding cells, and interviewed one at a time, late into the night, by Office Kailer and another NYPD Officer, James Quilty.

39. Cornielle told Officer Kailer, repeatedly, that the gun was hers, and that no one else in the car knew she had it. Cornielle also asked why her friends were being detained, even though the gun was obviously hers.

40. Shabazz, Arroyo, and Wallace did not know Cornielle was carrying the gun until Officer Kailer found it in Cornielle's purse.

41. Shabazz, Arroyo, and Wallace were not released. They were taken to Central Booking.

42. Shabazz and Wallace remained in custody, continuously, for almost six years.

43. The car, Shabazz, Arroyo, Wallace, and Corneille were searched thoroughly, but there was no physical evidence showing that anyone smoked any marijuana inside the car – no residue in the ashtray, no matches or lighter, nothing.

44. The purse containing the gun was vouchered and listed Cornielle as the owner. The purse was, essentially, empty (except for the gun, which had been removed). Officer Kailer signed the voucher himself.

45. Officer Kailer also vouchered the gun, and listed Cornielle as the owner. He signed the voucher himself.

46. The gun was not tested for fingerprints, and the bullets inside the gun were not tested for fingerprints. Office Kailer initially ordered fingerprint testing, but, for some unknown reason, the tests were not completed or were not disclosed.

47. Later, Cornielle told Wallace's attorney that the gun was hers, and she said she was confused as to why the others were being blamed.

**Officer Kailer Manufactures Evidence and Lies to the Manhattan District Attorney's Office**

48. On information and belief, Officer Kailer was not satisfied only arresting Cornielle for possessing the handgun, and he knew that he had no reason to search the car. So Officer Kailer decided to lie to justify the traffic stop, and to lie to charge Shabazz, Arroyo, and Wallace with possession of the handgun.

49. In furtherance of his scheme to falsely charge the three men with weapons possession, Officer Kailer manufactured photographic evidence. He took a bottle of Champaign from the truck of the car, and a mostly-empty bottle of Hennessey that had not been in the car at the time it was stopped by police, and placed them in the backseat of the car. He took photographs of the bottles.

50. Later, Officer Kailer admitted that he searched the trunk of the car after it was brought back to the precinct.

51. Officer Kailer provided these photographs to ADA Joanne Li.

52. On January 10, 2008, Officer Kailer drafted a misleading and inaccurate affidavit, and forwarded it ADA Li, initiating the prosecution against Shabazz and Wallace.

53. In the affidavit, Officer Kailer never states that Cornielle owned the purse and tried to leave the car with it. He never states that he only found the purse (and the gun) in the car because Sergeant Albin told her to put it back in the car. Officer Kailer never said that Cornielle had admitted that it was her gun.

54. When Officer Kailer drafted the affidavit, he had no reason to believe that Shabazz or Wallace possessed the gun. Yet Officer Kailer claimed, under oath, that Shabazz and Wallace committed the offense: "PL265.03(3) Criminal Possession of a Weapon in the Second Degree."

55. Officer Kailer provided this affidavit to ADA Li.

56. Officer Kailer lied about how he discovered the handgun. He claimed that he saw the purse sitting vertically in the middle of the back seat of the car, with the back of the purse leaning against the seat and the front of the purse facing the windshield. He claimed that the handgun was resting on the bottom of the purse, upside down. The top of the gun was resting flat on the bottom of the purse, and the butt of the gun was sticking out of the top of the purse approximately 1 inch.

57. The purse had a flap that could be latched closed. But Officer Kailer claimed that the purse was not latched, the flap was askew (at most covering the butt of the gun a "speck"), and the whole purse was pressed down, by the weight of the gun, allowing the butt of the gun to stick out.

58. Thus, Officer Kailer claimed, he could see the black butt of the gun sticking out of the black purse, when he searched the car for his own safety, after all four passengers had been removed.

59. There was nothing in the purse except the handgun and some small pieces of paper.

60. Officer Kailer's story is not only false, but incredible. The handgun was 5 1/8" by 6 1/8" and weighed approximately 19 oz., and the purse was at least 8" tall and 12" wide. The handgun easily fit completely inside the purse. In addition, Officer Kailer claimed the weight of the handgun crushed the purse down, which was impossible because the handgun was on the bottom of the purse, not the top. Later, at trial, Officer Kailer could not recreate how the handgun was positioned inside the purse. He also admitted that he had a camera, but never photographed how he claimed he found the handgun.

61. Officer Kailer lied about why he pulled over the car, and why he searched it. Officer Kailer claimed that the car switched lanes without using a signal. Then, he claimed, he smelled marijuana when Arroyo rolled down in his window.

62. This was false. In fact, Officer Kailer later admitted that he never saw any marijuana in the car, he (and Sergeant Albin) never saw anyone toss anything from the car, he (and Sergeant Albin) never found anything that could be used to smoked marijuana in the car, and he only recovered (unused) marijuana from Arroyo after he was inside the precinct.

63. Officer Kailer was the only NYPD Officer that ADA Li interviewed, several hours after the arrest, when she prepared the case for the grand jury. So he was the only source of false evidence.

9

**Officer Kailer Lies to the Grand Jury**

64. Several days later, Officer Kailer testified to a grand jury, and lied repeatedly.

65. First, Officer Kailer testified that he pulled over Arroyo, Shabazz, Wallace, and Cornielle because they were speeding and weaving in and out traffic. This was not accurate, and, on information and belief, was fabricated to justify the traffic stop.

66. Second, Officer Kailer testified that he smelled marijuana when he spoke to Arroyo, and claimed that is why he asked Arroyo to get out of the car. This was not accurate, and, on information and belief, was fabricated to justify pulling everyone out of the car and searching it.

67. Third, he testified that when he looked in the car, after all the passengers had left, he saw the purse with the butt of a gun sticking out of it, sitting in the middle of the back seat. This was not accurate, and on information and belief, was fabricated to make it appear that the gun belonged to everyone in the car, and not just Cornielle.

68. Fourth, he testified that he found a bottle of Champaign and a mostly-empty bottle of Hennessy on either side of the purse. This was not accurate, and on information and belief, was fabricated to make Shabazz, Wallace, Arroyo, and Cornielle seem scary and dangerous.

69. Fifth, when the grand jurors started to suspect that Officer Kailer's story was not plausible, he lied about the handgun. When asked how large it was, Officer Kailer claimed it was 8 to 10 inches. This was only days after he found the handgun, so Officer Kailer knew that the gun was smaller, and thus could not have been sticking out of the purse the way he claimed.

70. Officer Kailer also made several material omissions. He never told the grand jury that Cornielle had admitted the handgun belonged to her. And he never told the grand jury that Cornielle had attempted to take the purse, including the gun, out of the car, meaning that the only

reason the gun was found in the car was that Sergeant Albin told Cornielle to put the purse back in the car.

71. The grand jury indicted Shabazz, Wallace, and Cornielle for possessing the handgun. Arroyo was indicted for possessing a very small amount of marijuana, but the drugs were later excluded because there was no probable cause to remove Arroyo from the vehicle.

**Officer Kailer Lies during the Mapp Hearing**

72. At the Mapp hearing to determine whether the handgun should be suppressed because Officer Kailer had no justification for the traffic stop or the search, he repeated the same lies.

73. Officer Kailer testified, falsely, that the car, driven by Arroyo, was speeding and changing lanes, and that was why he pulled the car over.

74. Officer Kailer testified, falsely, that he smelled marijuana when he spoke with Arroyo after pulling over the car.

75. And Officer Kailer testified, falsely, that he saw the butt of the handgun sticking out of the purse.

**The Trials and Appeals**

76. Cornielle was tried separately from Wallace and Shabazz.

77. Cornielle was ready to plead guilty, but ADA Li said that she would not accept any plea from her unless Shabazz and Wallace also pled guilty. They refused, so Cornielle was forced to trial.

78. At the trial, Cornielle admitted that she told Wallace's attorney that the gun was hers. But, remarkably, she was acquitted of all charges.

79. On December 15, 2008, Wallace and Shabazz's trial started.

80. At that trial, Officer Kailer lied again.

81. Officer Kailer lied to the jury about the initial traffic stop, and that he smelled marijuana after he pulled the car over and started speaking to Arroyo.

82. Officer Kailer lied and claimed that he found the handgun in the middle of the backseat, with the butt sticking out of the purse, which was upright between Cornielle and Shabazz.

83. When Officer Kailer tried to recreate how he found the handgun, he could not. Officer Kailer placed the handgun in the bag and placed the center of the purse on the rail that was part of the witness box. This forced the butt of the handgun up well over an inch.

84. This was not an accurate demonstration. Officer Kailer had testified earlier that the middle of the backseat, where he found the gun, was essentially falt, only 1 or 2 centimeters higher than the rest of the backseat. When a court officer placed the bag on a table, the butt of the gun was obscured and Officer Kailer admitted that – when the gun and purse was placed on a flat surface – it did not look anything like how he claimed he found the handgun, now arguing, falsely, that the backseat had a large hump.

85. There is no photograph, and no demonstration in the record, that ever shows that it is even possible that Officer Kailer found the gun in the way he claimed.

86. ADA Li entered into evidence and presented the jury with the photographs that Office Kailer had fabricated. These photographs showed a bottle of Hennessy and a bottle of Champaign in the middle of the backseat.

87. Officer Kailer testified that the photographs were accurate, and he used the photographs to falsely describe where he claimed he found the purse and the gun.

88. Sergeant Albin contradicted Officer Kailer's testimony. He said that he did not see anything in the middle of the backseat of the car at the time Officer Kailer claimed he saw both the liquor bottles and the purse with the gun.

89. There was no physical evidence introduced against Shabazz or Wallace that connected them to the handgun in any way.

90. Shabazz and Wallace's attorneys attempted to have Wallace's former attorney testify that Cornielle had admitted the gun was hers. ADA Li objected, and the testimony was suppressed.

91. The jurors took particular notice of both the false photos of the Hennessy and Champaign, and Officer Kailer's testimony regarding how he found the purse. In fact, the jurors asked for this specific evidence to be provided to them while they were deliberating.

92. Shabazz and Wallace were convicted of weapons possession.

93. Shabazz and Wallace appealed. The New York Supreme Court, Appellate Division, First Department denied the appeal. But on October 13, 2013 the New York Court of Appeals held that Wallace's attorney should have been permitted to testify that Cornielle admitted the gun was hers, and ordered a new trial.

94. Shabazz remained in prison until December 2013, when he was released on bail.

95. Wallace remained in prison until November 29, 2013, when he was released on bail.

96. On June 30, 2014, the New York County District Attorney decided to abandon the charges against Shabazz and Wallace.

**Damages**

97. Shabazz remained imprisoned from January 2008 until December 2013. He was not able to be with his three children, and he was not able to be with his wife, both of which caused him significant distress.

98. Shabazz was employed, both in construction and in his own business, before he was wrongfully arrested and convicted. As a result of his wrongful conviction, Shabazz lost significant income, and was not able to advance his career, leaving him with a lower income when he left prison than he would have had if he had never been placed in prison.

99. Finally, Shabazz suffered because he was not able to help his ailing mother. His mother relied on income from rental properties that Shabazz was not able to help maintain.

100. Wallace remained imprisoned from January 2008 until the day after Thanksgiving in November 2013.

101. While imprisoned, Wallace was separated from his wife, Samantha Wallace, and their child. He was also unable to work and provide for his family. As a result of his wrongful conviction, Wallace lost significant income, and was harmed considerably.

**COUNT ONE**

**42 U.S.C. § 1983 4th and 14th Amendment Claims
for Malicious Prosecution**

102. Plaintiffs hereby incorporate paragraphs 1 through 101 as if fully set forth herein at length.

103. Officer Kailer initiated the prosecution against Shabazz and Wallace by providing an affidavit to ADA Li falsely accusing Shabazz and Wallace of illegally possessing the handgun, and by providing false information, including the photographs, to ADA Li to ensure that she would prosecute Shabazz and Wallace.

104. The proceedings ended in Shabazz and Wallace's favor when the New York County District Attorney's Office abandoned the charges against them.

105. Officer Kailer initiated the prosecution without probable cause. He never had any reason to believe Shabazz or Wallace was connected to the gun, and, in fact, he deliberately lied in order to connect them to the gun.

106. Officer Kailer's malice is shown by the fact he deliberately initiated the charges against Shabazz and Wallace without probable cause, and then lied repeatedly under oath to ensure they were convicted.

107. Shabazz and Wallace suffered an injury under the Constitution of the United States in that they were deprived of their liberty without due process of law.

## COUNT TWO

### 42 U.S.C. § 1983 4th and 14th Amendment Claims for Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence

108. Plaintiffs hereby incorporate paragraphs 1 through 107 as if fully set forth herein at length.

109. Officer Kailer deliberately fabricated photographic evidence – the photographs showing the partially empty bottle of Hennessy and the bottle of Champaign in the middle of the backseat of the car – and he deliberately provided this fabricated evidence to ADA Li.

110. Officer Kailer also deliberately fabricated testimonial evidence, by creating a false story of how he found the handgun in the middle of the backseat, and providing this false story directly to ADA Li.

111. Officer Kailer also lied about the traffic stop, and how he found the handgun, to ensure that the handgun would be admitted into evidence against Shabazz and Wallace.

15

112. On information and belief, Officer Kailer created this fabricated evidence so that ADA Li would use it in the trial against Shabazz and Wallace, knowing that this fabricated evidence could wrongly convince a jury of their guilt.

113. The fabricated evidence constituted the majority of the evidence presented against Shabazz and Wallace, and, on information and belief, convinced the jury that Shabazz and Wallace were guilty.

114. Consequently, this fabricated evidence denied Shabazz and Wallace their right to a fair trial.

## COUNT THREE

### State Law Malicious Prosecution Claim

115. Shabazz hereby incorporates paragraphs 1 through 114 as if fully set forth herein at length.[1]

116. Officer Kailer initiated the prosecution against Shabazz by providing an affidavit to ADA Li accusing Shabazz of illegally possessing the handgun, and by providing false information, including the photographs, to ADA Li to ensure that she would prosecute Shabazz.

117. The proceedings ended in Shabazz's favor when the New York County District Attorney's Office withdrew and abandoned the charges against Shabazz.

118. Officer Kailer initiated the prosecution without probable cause. He never had any reason to believe Shabazz was connected to the gun, and, in fact, he deliberately lied in order to connect Shabazz to the gun.

---

[1] Wallace served a timely notice of claim, but was unable to appear for his 50-h hearing because he was incarcerated on unrelated charges. The Comptroller of the City of New York agreed to adjourn the 50-h hearing until after Wallace is released, but only if Wallace agreed not to conduct any discovery or press his case in any way until after the hearing. Consequently, Wallace is not bringing state law claims at this time.

119.     Officer Kailer's malice is shown by the fact he deliberately initiated the charges against Shabazz without probable cause, and then lied repeatedly under oath to ensure Shabazz was convicted.

### **COUNT FOUR**

**State Law Respondent Superior Claim Against
City of New York for Malicious Prosecution**

120.     Shabazz hereby incorporates paragraphs 1 through 119 as if fully set forth herein at length and further alleges as follows.

121.     At all times relevant to this complaint the individual defendants acted as agents of, and in the scope of their employment with, the City of New York. The conduct by which defendants committed the tort of malicious prosecution was undertaken while defendants were on duty, carrying out their routine investigative functions as New York Police Department detectives or officers, and engaging in such conduct as would have been reasonably expected by their employer.

122.     The City of New York is liable for its agents' state law tort of malicious prosecution under the doctrine of respondeat superior.

**WHEREFORE**, Shabazz and Wallace pray as follows:

1.     That the Court award compensatory damages to them and against defendants, jointly and severally on each and every claim herein, in an amount to be determined at trial;

2.     That the Court award punitive damages to them and against the individual defendant, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

3.     For a trial by jury;

4. For pre-judgment and post-judgment interest and recovery of their costs, including reasonable attorney's fees pursuant to 42U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

5. For any and all other relief to which they may be entitled.

Dated: New York, New York
November 12, 2015

                                      EATON & VAN WINKLE

                                      _____/s/_____
                                      By: Peter Cross, Esq.
                                             Robert Rickner, Esq.

*Attorneys for Plaintiffs*
*Omar Shabazz and Donald Wallace*

3 Park Avenue
New York, New York   10016
(212) 561-3601 – tel
(212) 779-9928 – fax
pcross@evw.com
rrickner@evw.com